240 P.3d 1182 (2010)
In re the Estate of Audrene G. SHERRY, Deceased.
Barbara Griffith, Appellant,
v.
Mark Sherry, as Personal Representative of the Estate of Audrene G. Sherry, Respondent.
In re the Estate of Fred S. Sherry, Deceased.
Barbara Griffith, Appellant,
v.
Mark Sherry, as Personal Representative of the Estate of Fred S. Sherry, Respondent.
No. 28373-9-III.
Court of Appeals of Washington, Division 3.
October 19, 2010.
*1183 P. Craig Beetham, Eisenhower & Carlson, Stuart Charles Morgan, Attorney at Law, Tacoma, WA, Andrea Burkhart, Burkhart & Burkhart PLLC, Walla Walla, WA, for Appellant.
James K. Hayner, Attorney at Law, Brandon L. Johnson, Minnick Hayner, P.S., Walla Walla, WA, for Respondent.
SIDDOWAY, J.
¶ 1 Barbara Griffith appeals the trial court's construction of her parents' wills. She contends the trial court erred in determining that the wills unambiguously authorized her brother, the personal representative, to distribute to her and her sister interests as "tenants in common" in the family farms, rather than distributing each a portion of the family farmland in fee. She also contends that in interpreting the wills, the trial court improperly considered extrinsic evidence, and that it erred in denying her request for *1184 discovery and mediation under the Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW. We find no procedural error by the trial court, but read the Audrene Sherry will to require distribution of separate parcels and find the Fred Sherry will ambiguous. We therefore reverse and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY
¶ 2 In August 2007 Audrene Sherry, Ms. Griffith's mother, passed away. Less than eight months later her father, Fred Sherry, died. The Sherrys were survived by their three children, Ms. Griffith (Barbara), Beverly Eastman (Beverly), and Mark Sherry (Mark).[1] The wills were admitted to probate in October 2007 and May 2008, respectively. Mark was appointed personal representative of both estates.
¶ 3 Both estates included farmland: some owned indirectly, through shares of Fred Sherry Farms, Inc., a family farm corporation, and some owned outright. Both wills provided that Mark, who was actively engaged in farming, be allocated the Sherrys' shares in Fred Sherry Farms, and thereby receive the parents' entire interest in farmland and other farm-related assets owned indirectly, through the farm corporation. That disposition is not at issue here.[2] In speaking hereafter of "the farmland," we refer only to the farmland owned outside the farm corporation.
¶ 4 Article IX of Audrene Sherry's will provides in pertinent part:
All of the property that is to be distributed according to this Article IX shall be distributed unto my children, BEVERLY S. EASTMAN, BARBARA GRIFFITH and MARK SHERRY, equally, subject, however, to the following allocations to be made by the personal representative. The personal representative is to allocate and divide the farmland equally between my children, with the children of a deceased child to inherit by right of representation. After dividing the farmland, it is my desire that the remaining assets be divided equally between my children, except that my son, MARK SHERRY, shall receive shares of stock in Fred Sherry Farms, Inc., in lieu of other assets of equal value using the appraised values in my estate to make this division.
Clerk's Papers (CP) at 11-12. Section 5.1 of Fred Sherry's will similarly directed Mark to "allocate and divide the farmland equally between my children," stating, "It is my desire for my three children to inherit assets of nearly equal value." CP at 123. Fred Sherry's will likewise bequeathed all of Fred Sherry's shares in the farm corporation to his son.
¶ 5 Mark ultimately decided to distribute the farmland in his parents' estates to his sisters and himself as tenants in common, over Barbara's objection that the wills required that each child receive separate property. On June 15, 2009, Barbara filed petitions under RCW 11.96A.090 in both estates asking that the court construe the wills as she contended, and order Mark to comply. Evidence submitted to the court by Barbara in support of the petitions consisted of correspondence between attorneys for the parties and two wills of Fred Sherry executed prior to his final 2007 will, including a will executed by him in 2003 that appointed Barbara his personal representative, bequeathed her a particular farm, and directed her to "allocate and divide" the remaining farmland between Mark and Beverly. CP at 67.
*1185 ¶ 6 Mark opposed Barbara's petitions, taking the position that the wills unambiguously authorized him to preserve the farmland intact and distribute undivided interests. Alternatively, Mark contended that the wills were ambiguous and submitted an affidavit of H.H. Hayner, the Sherrys' longtime lawyer and author of their wills, attesting to his conversations with the Sherrys and his understanding of their intent, and expressing his opinion that the wills unambiguously gave Mark discretion to distribute undivided interests.
¶ 7 The initial hearing took place approximately a month after the petitions were filed. At the hearing the trial judge ordered the estates consolidated for purposes of the TEDRA petitions and, after hearing argument of counsel, denied the petitions. The trial judge found the wills unambiguous, concluding that the terms "allocate and divide" did not require Mark to distribute separate property in fee simple.[3] Report of Proceedings (RP) at 11. The trial judge observed that Barbara was not prejudiced by this construction inasmuch as she could file a partition action. RP at 11-12. Having found the wills unambiguous, the trial judge did not review the evidence submitted with the petitions and response or address Barbara's requests for discovery or mediation.
¶ 8 Barbara Griffith filed this appeal.

ANALYSIS

I. Appellant's Assignments of Procedural Error
¶ 9 We first dispense with Barbara's assignments of error to the procedure followed in the trial court. She argues that the trial judge improperly considered the Hayner affidavit in interpreting the wills, even though both parties had urged that the wills were unambiguous. Br. of Appellant at 3, 22-24. The affidavit was submitted several days before the hearing, in support of Mark's argument in the alternative that if the wills were ambiguous, then extrinsic evidence supported Mark's discretion to distribute undivided interests. But the trial judge never reached the Hayner affidavit. He concluded that the wills were clear on their face.
¶ 10 Barbara nonetheless argues the trial judge's reference in his written order to having "considered the Motion, pleadings, and Court file" shows that he impermissibly relied on the affidavit. CP at 212; Br. of Appellant at 11. We disagree. When read in conjunction with the transcript of the oral ruling, in which the trial judge never referred to the Hayner affidavit or indicated that he was considering extrinsic evidence, the order is reasonably read as referring to only those materials in the files that he would naturally and necessarily have considered, such as the petitions, the answer, and the wills.
¶ 11 Barbara also argues that the trial judge erred when he refused to address her requests for discovery and to proceed with mediation pursuant to TEDRA. Yet the trial judge was authorized by TEDRA, if able, to resolve issues of law and fact at the initial hearing. RCW 11.96A.100. When he concluded that the meaning of the wills was unambiguous and declared their meaning, he resolved the only claim raised by the TEDRA petitions. With that, the requests for discovery or mediation were moot.

II. Assignment of Error to the Conclusion That the Wills were Unambiguous
¶ 12 The primary contention of both parties is that the Sherrys' wills unambiguously state their intent whether the farmland must be divided or can remain undivided. At the same time, the parties disagree about the type of distribution the wills unambiguously permit. The interpretation of a will is a question of law that we review de novo. In re Estate of Curry, 98 Wash.App. 107, 112-13, 988 P.2d 505 (1999), review denied, 140 Wash.2d 1016, 5 P.3d 8 (2000). It is on this issue of interpretation that we part ways with the trial court.
¶ 13 The paramount duty of the court is to give effect to the testator's intent *1186 when the will was executed. RCW 11.12.230; In re Estate of Bergau, 103 Wash.2d 431, 435, 693 P.2d 703 (1985); In re Estate of Price, 73 Wash.App. 745, 754, 871 P.2d 1079 (1994). If possible, the court must determine the testator's intent from the language of the will as a whole. Bergau, 103 Wash.2d at 435-36, 693 P.2d 703. Specific provisions must be construed in the context of the entire will. In re Estate of Riemcke, 80 Wash.2d 722, 728, 497 P.2d 1319 (1972). The court must endeavor to give effect to every part of the will and try to reconcile apparently inconsistent provisions. Bergau, 103 Wash.2d at 435, 693 P.2d 703.

Is the testators' intent sufficiently clear to ascertain the meaning of the wills without addressing the language in dispute?
¶ 14 In support of Barbara's position that the wills require distribution of separate farmland in fee, she first points to the terms "divide" and "allocate," which she contends have a plain meaning that is opposite of tenancy in common, the essential attribute of which is unity of possession, relying on Rouse v. Glascam Builders, Inc., 101 Wash.2d 127, 677 P.2d 125 (1984). Mark responds that if a technical reading of the several words emphasized by Barbara conflicts with the remainder of the wills, then the meaning of those words yields to the meaning and legal effect of the wills as a whole. Riemcke, 80 Wash.2d at 727-28, 497 P.2d 1319. We agree with Mark, and begin by addressing whether the testators' intent is clear from the remaining language of the wills.
¶ 15 Both wills are clear that a principal objective of the Sherrys was to treat their children equally, or as close to equally as practicable. Article IX of Audrene Sherry's will provides that all of the property in the credit shelter trust created by her will "shall be distributed unto my children . . . equally, subject, however, to the following allocations to be made by the personal representative. The personal representative is to allocate and divide the farmland equally between my children." CP at 11. Her will contemplates a period of farm operations by the trust should she predecease her husband, and permits a lease of the ground to a beneficiary, even for a term that could continue following her husband's death, so long as the lease is "comparable as to terms and as to rental rates as are normal in leases of comparable farm lands." CP at 10. Article V of Fred Sherry's will provides that "[t]he personal representative is to allocate and divide the farmland equally between my children" and that "[i]t is my desire for my three children to inherit assets of nearly equal value." CP at 123.
¶ 16 Equally clear is that both wills treat ownership of the stock of Fred Sherry Farms, Inc. as more important to Mark than to his sisters, and accommodate Mark's interest in two ways. Each will specifically bequeaths to Mark all of the parent's stock in Fred Sherry Farms in lieu of assets of equal value. In addition, both wills encourage the daughters to exchange their stock in the farm corporation with Mark for other assets, so that Mark can become the sole shareholder. CP at 12, 123.
¶ 17 Finally, the Fred Sherry will reflects an intent, with respect to the farmland in his estate, to give Mark a limited prerogative in the event of a sale of farmland by Barbara or Beverly, granting Mark a 15-year right of first refusal. CP at 124. Audrene Sherry's will does not create a right of first refusal.
¶ 18 In interpreting the wills, we are obliged to give effect to every part. In re Estate of Shaw, 69 Wash.2d 238, 242, 417 P.2d 942 (1966). The difference between the parents' treatment of stock in Fred Sherry Farms, Inc. and the farmland owned outright is clear, and cannot be ignored. When it comes to the farm corporation, the wills reflect Fred and Audrene Sherry's intentions that Mark receive all of their stock (with the daughters taking other assets) and a hope that, by exchanging other assets, Mark can become the sole owner. But when it comes to the farmland owned outside the corporation, neither will gives the land to Mark to the exclusion of the daughters, nor does either will grant Mark an option to acquire the farmland.
¶ 19 With respect to the farmland, equal treatment is the rule. It is to be allocated and divided "equally." Audrene Sherry's will *1187 provides that any lease of the farmland to Mark (or any other beneficiary) during the period of the credit shelter trust must be on fair market terms. The only prerogative given Mark to acquire more than his one-third share of the farmland is the right of first refusal, which is not exercisable unless Barbara or Beverly decide to sell and requires him to meet a third party's price. Even that prerogative is granted to Mark only in Fred Sherry's will.
¶ 20 Having identified this intent, we next consider whether it compels us to construe "allocate and divide" to permit Mark to distribute undivided interests in the farmland. Allowing him to distribute undivided interests is consistent with his parents' recognition of his interest, and their evident desire, that he continue to farmbut a requirement that he allocate the farmland and distribute parcels in fee to his sisters is consistent with that intent as well. Reading the wills to require that Mark divide the farmland into separate parcels and allocate them among his sisters and himself allows him, subject to his fiduciary duty as personal representative, to allocate to himself that equal third of the farmland which, by location or type, best complements his farming operation. This is an advantage he would not have in a separate partition action.
¶ 21 Turning to the parents' intent to treat the children equally, construing the wills to permit Mark to distribute undivided interests runs counter. Some of the daughters' property will already be subject to Mark's right of first refusal under the Fred Sherry will. An owner of property subject to a right of first refusal lacks the right to freely dispose of her property, a valuable incident of ownership; a practical effect of the right of first refusal may be to deter third parties from bidding for the property, thereby depressing its value. Mfr'd Hous. Cmtys. of Wash. v. State, 142 Wash.2d 347, 364-66, 13 P.3d 183 (2000). Still, Fred Sherry's intent to create the right of first refusal is clear, and it is not inconsistent with his expressed intent that his three children inherit assets of "nearly" equal value. CP at 123.
¶ 22 To allow distribution of undivided interests is a further and even more material departure from equal treatment. Undivided fractional interests in land have diminished value in light of the difficulty in finding a willing buyer. See In re Estate of Ehlers, 80 Wash.App. 751, 760, 911 P.2d 1017 (1996) (discounting value of undivided interests by 25 percent). Working out the "`unity' of possession" held by tenants in common is one of the difficult areas of concurrent estates. I WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 9.2(1) (3d ed. 1997).
¶ 23 Mark argued in the trial court and argues here that Barbara is not prejudiced by the distribution of undivided interests because she can commence a partition action. But Barbara's ability to commence a partition action does not decide the question that is before us, which is whether Audrene and Fred Sherry intended that their personal representative should make the division of farmland without the need for a partition action. Accord First-Citizens Bank & Trust Co. v. Carr, 279 N.C. 539, 184 S.E.2d 268, 272 (1971). Even if we did not regard this as the controlling issue, we would reject Mark's argument that a statutory partition action is the only practical procedure, or even a superior procedure. Mark presents no authority or reason why his division of the property, subject to his obligation to act in "good faith and with honest judgment" as required by RCW 11.68.090(2), is not as efficient as a separate partition action. In this connection, we note that in jurisdictions that have adopted the Uniform Probate Code, devisees of undivided interests can elect to partition in the probate proceeding, commonly resulting in a partition agreement. See, e.g., Uniform Probate Code § 3-911 and its official comment, 8 pt. 2 U.L.A. 278 (1998). We also agree with Barbara that requiring a separate partition action defeats the purpose of probate and TEDRA to expeditiously administer and settle estate matters. RCW 11.96A.010,.020. The record reveals that these are taxable estates in which date of death appraisals have been or will be prepared. CP at 187-96.
¶ 24 Analysis of Audrene and Fred Sherry's intent without regard to the disputed terms "allocate" and "divide" does not persuade *1188 us to read their wills in the manner urged by Mark. We therefore turn to a review of each will in its entirety, including consideration of their directives that the personal representative divide and allocate the farmland.

Giving the disputed language its plain meaning, does it resolve the issue of whether the personal representative may, or may not, distribute undivided interests in the farmland?
¶ 25 Barbara argues that the dictionary defines the word "`divide' as: `separate,' `cleave, part,' `distribute, apportion,' `to cause to be separate, distinct or apart from one another,' `to separate into opposing sides or parties,' [`]to mark divisions on,' and `to subject to or use in mathematical division.'" It defines "`allocate' as, `allot, assign.'" It defines "`allot' as, `to distribute as a share, syn assign, apportion, allocate.'"[4] She argues that Black's Law Dictionary defines "`divide' as, `[t]o cut into parts, disunite, separate, keep apart. The term is synonymous with distribute.'"[5]
¶ 26 Mark responds that a definition of "`distribute'" relied upon by Barbara encompasses division "`in shares.'"[6] He, too, relies upon the portion of Fred Sherry's will creating the right of first refusal, but for its language that the right is triggered if his sisters elect to sell "their share of the farmland, or any part thereof." CP at 124 (emphasis added). The trial judge noted use of the term "shares" in delivering his oral decision. RP at 11-12.
¶ 27 Neither party cites any authority addressing whether a directive that a personal representative "allocate and divide" property includes authority to distribute it undivided. Our own review reveals that some of the language emphasized by Barbara appears in the partition statute, chapter 7.52 RCW, which states that the duty of referees in a partition action is to "divide the property, and allot the several portions thereof to the respective parties." RCW 7.52.090 (emphasis added). And a few cases located from other jurisdictions support Barbara's argument from the words "divide" and "allocate." Rackemann v. Tilton, 236 Ill. 49, 86 N.E. 168, 173 (1908) (resolving claims of legatees and Harvard University under the will of John Hancock, and holding, "To convey to each of the owners an undivided part, as counsel insists [the trustee] should do, is not to divide the property but to leave it undivided"); First-Citizens Bank & Trust Co., 184 S.E.2d at 272-74 (holding that a directive to "distribute" and "allot" property implies partition). In none of those cases did the will include a seemingly inconsistent reference to the existence of post-distribution "shares" of the property distributed.
¶ 28 With the intent of the testators in mind, and reviewing the wills de novo, we conclude that Audrene Sherry's will unambiguously requires that property in the trust be divided and distributed in separate parcels. The Audrene Sherry will does not create or recognize any right of first refusal in Mark to acquire his sisters' farmland, nor does it include any reference to the children having post-distribution "shares" of farmland. It speaks only of treating the three children equally, in language imposing an affirmative obligation on the personal representative to make "the following allocations" and "to allocate and divide the farmland equally between my children." CP at 11. To read the Audrene Sherry will as Mark urges would require us to ignore this language, in favor of an assumption that has no textual support in the will.
¶ 29 We conclude that the changes to the Fred Sherry will following his wife's death, and in particular the creation of a right of first refusal in Mark to acquire his sisters' "share of the farmland," creates an ambiguity and potentially an inconsistency with the will's directive that the personal representative "allocate and divide" the farmland equally, requiring that the trial judge consider extrinsic evidence as an aid to interpreting Fred Sherry's will.

*1189 III. Consideration of the Extrinsic Evidence Before the Trial Court
¶ 30 Mark argues that if we conclude that the Fred Sherry will is ambiguous, we nonetheless affirm the trial court's dismissal of the petitions on the basis of the Hayner affidavit, which he argues is the only extrinsic evidence offered by either party, and the only evidence available in light of the dead man's statute, RCW 5.60.030. Br. of Resp't at 10. If there is ambiguity as to the testator's intent, extrinsic facts are admissible to explain the language in the will. Riemcke, 80 Wash.2d at 727, 497 P.2d 1319. Washington cases provide that testimony of the drafter, including as to the testator's intent, is one piece of evidence admissible to explain the language. Bergau, 103 Wash.2d at 436, 693 P.2d 703.
¶ 31 We decline the invitation to preempt the role of the trial court. The extrinsic evidence before the trial court raises issues of fact. In addition to the Hayner affidavit, the 2003 will of Fred Sherry is in evidence; Barbara contends it supports her position that her father contemplated distribution of separate farmland to each child. Even the Hayner affidavit does not unambiguously support Mark's position; see, e.g., its paragraph 9, stating that "Fred was adamant that he wanted Mark to make [the] allocation. Fred told me that, in his opinion, the only way that the allocation could be done fairly if [sic] Mark was to end up with the corporation and each of his daughters to [sic] end up with a larger percentage interest in the farm land." CP at 104.
¶ 32 Second, the dead man's statute does not foreclose testimony by other third party witnesses, and a deposition of Mr. Hayner or discovery of his filesnow at issue by virtue of his affidavitcould reveal countervailing evidence.[7] As noted above, because the trial judge construed the wills as a matter of law, he never reached Barbara's requests for discovery or mediation. With our decision that the Fred Sherry will is ambiguous, the trial judge may consider what discovery to permit and whether to order alternative dispute resolution before he, not we, addresses the ambiguity.[8]
¶ 33 We reverse the trial court's dismissal of the TEDRA petition and remand for proceedings consistent with this opinion.
WE CONCUR: KULIK, C.J., and BROWN, J.
NOTES
[1] Given the common last name of many of the actors, we refer to the Sherry children by their first names. Our reference to "the Sherrys" here, and hereafter, is to Fred and Audrene Sherry.
[2] The record discloses estimates of the value of assets owned within and without the farm corporation, and reveals that the stock in the farm corporation has an appraised value of $1,441,000 and that the estates are projected to have a gross value of several million dollars, with Fred Sherry's estate, at over $2 million, being the larger of the two. Clerk's Papers at 187-96. The nature and character of the estate assets, noted in the briefs, are facts that we properly consider in construing the meaning of the testators' intent. See, e.g., In re Estate of Bergau, 103 Wash.2d 431, 436, 693 P.2d 703 (1985) (because a testator employs language in the will with regard to facts within his knowledge, the court must consider all the surrounding circumstances).
[3] The trial judge spoke only of Fred Sherry's will, as does Mark's briefing in some instances. However, both parties' statement of the case indicate, as does the record, that both estates include farmland whose disposition is at issue.
[4] Br. of Appellant at 18-19 (emphasis omitted) (quoting MERRIAM-WEBSTER DICTIONARY, HOME AND OFFICE EDITION 14, 153).
[5] Id. (alteration in original) (quoting BLACK'S LAW DICTIONARY 153 (6th ed.1990)).
[6] Br. of Resp't at 6 (quoting BLACK'S, supra, at 475).
[7] Until Mark determined as personal representative to waive the attorney-client privilege belonging to his parents, deposition and document discovery into Fred and Audrene Sherry's dealings with Mr. Hayner was presumably unavailable. See In re Estate of Covington, 450 F.3d 917, 925 (9th Cir.2006).
[8] With respect to discovery and mediation, Mark argued in opposing Barbara's assignments of procedural error that mediation and further discovery should be foreclosed. Having found no procedural error, we did not address his arguments. For purposes of remand, however, we note the trial court's authority and discretion. See, e.g., RCW 11.96A.100(10) (if initial hearing does not result in a resolution, the court may determine the scope of discovery and set a schedule for further proceedings). In this case, the initial hearing on the petitions was conducted only a month after the petitions were filed, and only a few days after Mark, as personal representative, waived the attorney-client privilege by filing the Hayner affidavit, thereby creating the first opportunity for discovery into privileged matters.